UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| RANDALL R. HUDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:04CV46 ERW |
| | ) | (TIA) |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §636(b).

## Procedural History

On August 16, 2001, plaintiff filed an application for Disability Insurance Benefits, alleging disability beginning on March 23, 1999 due to Rheumatoid Arthritis, Psoriatic Arthritis, and Fibromyalgia. (Tr. 46-48; 67) The application was denied on October 25, 2001. (Tr. 36-39) On August 20, 2002, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 203-237) In a decision dated August 30, 2002, the ALJ determined that Plaintiff was not under a disability at any time through the date of decision. (Tr. 19-25) On June 10, 2004, the Appeals Council denied plaintiff's request for review. (Tr. 4-6) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was not represented by counsel. Also present were Rhonda Hudson, Beverly Marlotte, and Dr. John McGowan, Vocational Expert (VE). At the time of the hearing, Plaintiff was 45 years old, measured 6 feet 1 inch, and weighed about 210 pounds, commenting that his normal weight fluctuated between 180 to 210 pounds. Plaintiff testified that he was married with two dependent children, ages 14 and 19, and a 21-year-old son. He lived with his wife and three children, along with his 2-year-old grandson part of the time. Plaintiff stated that he occasionally drove, but he experienced pain while driving due to arthritis in his legs and arms. Plaintiff completed the tenth grade and had no vocational training. He last worked on March 22, 1999 as a supervisor at the Moberly Correctional Center. Plaintiff indicated that his duties also included making deliveries and lifting up to 200 pounds. Prior to his 10 year position as a supervisor, he worked a temporary job at the prison in maintenance and in the sign shop. The heaviest weight that he lifted was 200 pounds. Plaintiff stopped working in 1999 after receiving a shoulder injury which required surgery. (Tr. 205-217)

Plaintiff testified that Dr. Stitzer was his treating physician since 1995. Dr. Stitzer treated him for rheumatoid arthritis, psoriatic arthritis, and fibromyalgia. Plaintiff stated that Dr. Stitzer restricted Plaintiff's activities to lifting no more than 10 pounds and refraining from walking on concrete and pavement as much as possible. Plaintiff testified that he was unable to work because there were days he could not get out of bed. He stated that recently his skin fell off his feet rendering him unable to walk for three weeks. In addition, Plaintiff was unable to get out of bed five to eight days a month due to swelling in his joints. Plaintiff testified that he could not get dressed some mornings and that his wife had to dress him. Plaintiff further stated that he could not walk and sometimes wore braces on his ankles, knees, wrist and elbows. He opined that his condition was getting worse. He took

Celebrex, Allopurinol, Oxycontin, baby aspirin, and Neurontin. He testified that Oxycontin sometimes knocks him out for 8 to 12 hours. Although the Oxycontin prescription directed Plaintiff to take it every 12 hours, Plaintiff stated that he sometimes did not take the medicine as prescribed because he did not "want to be knocked out all the time." Plaintiff took his other medications as prescribed and reported that they helped but that he still had pain. (Tr. 217-221)

Plaintiff testified regarding his daily activities. He stated that he sat at his house and did laundry or tried to cook. He did not grocery shop or perform any activities outside of his home. Plaintiff stated that his son watched the two-year-old child. (Tr. 221-222)

Plaintiff's wife also testified on Plaintiffs' behalf. She stated that Plaintiff could not do anything anymore. Further, she testified that there were days when he just stayed in bed and that it was difficult to watch him do nothing. Plaintiff's mother-in-law, Beverly Marlotte, testified that life had become difficult for Plaintiff and his family. She stated that Plaintiff was previously an avid hunter and fisherman and that he could no longer perform those activities. She further testified that Plaintiff lacked the intelligence to work in an office. She also indicated that Plaintiff could not sit that long, nor could he work an eight-hour day without needing to go to bed. (Tr. 222-224)

Vocational Expert ("VE") Dr. John McGowan noted that Plaintiff had consistent income from 1988 through 1998. The VE titled Plaintiff's prior position as supervisor of maintenance, but he noted that the job was classified as skilled, which conflicted with Plaintiff's level of education. The VE questioned whether Plaintiff would qualify as skilled in work outside the prison setting. The ALJ then asked the VE to assume there was a hypothetical claimant of the same age, education, and work experience as Plaintiff who had an RFC for sedentary work but was further limited by a medically required cane. The claimant had further postural limitations such that he could occasionally climb

ramps, stairs, ladders, ropes, and scaffolds, but he should never be required to balance. In addition, he could occasionally stoop, kneel, crouch, and crawl. The claimant's manipulative limitations included reaching in all directions, including overhead. The claimant should avoid concentrated exposure to extremes of head and cold, vibrations, hazardous machinery, and heights. The VE stated that such a person could not return to Plaintiff's past work. The ALJ then added that the claimant could stand or walk with normal breaks for at least two hours in and eight-hour day and that he used the cane on occasion. The VE answered that under the hypothetical a claimant could perform only simple, direct entry, unskilled assembly type jobs. He stated that there were more of these types of jobs in Missouri than in the area where Plaintiff resided. Only 750 jobs near Plaintiff's home and 8,000 to 9,000 jobs in Missouri met the ALJ's hypothetical. (Tr. 228-233)

One of Plaintiff's witnesses mentioned that Plaintiff's hands became so swollen at times that he was unable to make a fist or bend his fingers. The ALJ then added a limitation on the upper extremities with regard to pushing and pulling. The VE stated that this limitation would further restrict the number of jobs Plaintiff could perform because sedentary jobs required use of the arms and hands. If the ALJ placed an additional limitation on manipulation due to swelling, there would be no jobs Plaintiff could perform, as sedentary work required the use of repetitive hand/finger action. Further, if the ALJ added a restriction of sitting only two hours at a time, there would be no work for Plaintiff. (Tr. 233-235)

## Medical Evidence

Plaintiff began seeing Phillip W. Stitzer, D.O. in July of 1998 and regularly thereafter for

4

complaints of arthritic aches and pains.[1] On November 9, 1998, Dr. Stitzer noted that no combination of medicines worked for Plaintiff. Beginning in December, 1998, Dr. Stitzer treated Plaintiff for rotator cuff tendonitis in the left shoulder, in addition to rheumatoid and degenerative arthritis. Throughout 1999, Dr. Stitzer prescribed various medications, noting that they did not provide much improvement. On July 14, 1999, Plaintiff complained of further problems with his shoulder despite recent surgery by Dr. Parker. An August 2, 1999 examination revealed mild amounts of all types of arthritis, along with a depressed mood from the arthritic discomforts. (Tr. 98-104; 124-138)

On June 22, 2000, Plaintiff saw Dr. Stitzer for a reevaluation of his chronic degenerative arthritis with possible overlying gout versus pseudogout. Plaintiff reported that he could not tell much difference with medication and that he was still having some problems. Dr. Stitzer did not feel Plaintiff was improved enough to return to manual labor. He noted that Plaintiff's arthritis was bad but that he had seen more severe. He also opined that Plaintiff suffered from mild depression due to his disability. (Tr. 105)

In a letter dated August 4, 2000, Dr. Jerome F. Levy noted that he evaluated Plaintiff on July 27, 2000 with regard to injuries Plaintiff sustained at work on March 22, 1999. After a full examination, Dr. Levy concluded that Plaintiff had a permanent partial disability, specifically 35% of

---

[1] In the Decision, the ALJ noted that Plaintiff filed a prior application for disability insurance benefits, which the Social Security Administration denied. This application was dismissed on May 24, 2000, and the Appeals Council denied the request for review. The ALJ found no good cause to reopen or disturb the prior decisions, noting that Plaintiff did not provide new or material evidence, or any other good reason to reopen. Therefore, the ALJ reviewed the evidence to determine whether Plaintiff had been disabled since May 25, 2000, the date after the previous dismissal. Because the ALJ found no cause to reopen Plaintiff's prior application, the undersigned cannot reevaluate the medical evidence. Bladow v. Apfel, 205 F.3d 356, 360-361 n.7 (8th Cir. 2000) (citation omitted). However, the Court will provide a brief overview of Plaintiff's medical history before May 25, 2000 to serve as "a backdrop to new evidence regarding [Plaintiff's] condition." Id.

the left upper extremity at the shoulder. Dr. Levy further noted that, while he did not evaluate the rheumatoid arthritis due to his lack of expertise in that area, Plaintiff may also have significant disability due to that disease. He remarked that there was evidence in Plaintiff's lower extremities of arthritis. (Tr. 169-173)

On December 1, 2000, Dr. Geetha R. Komatireddy, an Associate Professor in the Division of Immunology and Rheumatology at the University of Missouri Hospitals and Clinics examined Plaintiff for a follow-up visit. Dr. Komatireddy noted that Plaintiff's rheumatoid arthritis was stable and that his most active problem appeared to be fibromyalgia syndrome. Dr. Komatireddy noted "chronic pain from top to toe." Pain was his greatest problem, along with very poor sleep and extreme fatigue. An MRI of Plaintiff's spine was negative, and his LS spine showed only mild DJD. Dr. Komatireddy opined that plaintiff seemed very depressed and strongly recommended that Plaintiff see a neurologist and a psychiatrist. Further, Dr. Komatireddy encouraged Plaintiff to start working and exercising. (Tr. 140)

On January 9, 2001, Plaintiff reported to Dr. Stitzer that he was getting along fair. Dr. Stitzer noted that Plaintiff was in no acute distress. He recommended that Plaintiff continue his current work restrictions. Dr. Stitzer did not believe that Plaintiff could ever return to work. (Tr. 108) On January 10, 2001, Dr. Stitzer wrote a letter on behalf of Plaintiff, indicating that Plaintiff suffered from chronic rotator cuff tendonitis which had never and would never improve. Dr. Stitzer opined that Plaintiff was chronically disabled from this condition. (Tr. 174)

On June 11, 2001, Dr. Stitzer noted that Plaintiff had a history of moderate arthralgias of axial skeleton primarily, but all over his body. Plaintiff also complained of flaking in his scalp and facial region, which was consistent with psoriatic lesions. Dr. Stitzer noted that the doctors thought Plaintiff

6

may have fibromyalgia. He further noted that Plaintiff had not responded well to most treatments. He opined that Plaintiff was totally disabled and he prescribed Oxycontin for pain. (Tr. 109) During a visit on July 10, 2001, Plaintiff reported that he was getting along fair aside from some arthritic aches and pains, especially in his shoulders. Plaintiff stated that he was raising deer and had to carry water buckets, which aggravated his arthritis. Plaintiff's shoulders did not show active redness, warmth, or swelling. However, he did have reduced mobility and a painful arc. (Tr. 112)

Plaintiff saw Dr. Jeffrey Magrowski for a vocational evaluation on July 18, 2001. During the interview, Dr. Magrowski observed that Plaintiff had difficulty walking and sitting for any length of time. Plaintiff also used a cane to ambulate. Dr. Magrowski evaluated Plaintiff's medical records, background information, education/training, employment history, and work restrictions. He also administered various vocational tests to determine Plaintiff's intelligence, basic skills, clerical and mechanical skills, dexterity, and vocational interests. Dr. Magrowski concluded that the vocational testing results were generally very poor, noting that Plaintiff was almost illiterate and possessed menial intellectual skills. His vocational profile was compatible with an unskilled worker who was suited for labor type employment which would have been simple, routine, and repetitive. Dr. Magrowski opined that Plaintiff was not capable of successfully competing in the open available labor market for a new or different job. (Tr. 91-96)

Janie R. Vale, M.D., completed a Physical Residual Functional Capacity Assessment on September 5, 2001. Dr. Vale opined that Plaintiff could lift and/or carry 10 pounds occasionally and frequently; stand at least 2 hours in an 8-hour workday with a medically required hand-held assistive device; sit about 6 hours in an 8-hour workday; and push and/or pull with limitations in the upper extremities. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and

7

crawl. However, he could never climb ladders, ropes, or scaffolds. Plaintiff had manipulative limitations in reaching all directions, and he needed to avoid concentrated exposure to extreme heat, cold, vibration, and hazards. Dr. Vale assessed Plaintiff's medical records, noting that her conclusions differed from those of the treating/examining physicians. (Tr. 141-148)

On July 1, 2002, Dr. Stitzer re-evaluated Plaintiff for complaints of swelling in his joints, elbow pain, chronic shoulder discomfort, low back pain, knee pain, and hip pain. Dr. Stitzer noted that Plaintiff had not been able to hold down gainful employment for some time. The examination revealed a well-developed, well-nourished male in no acute distress. Plaintiff's mobility was fairly good, although slow and purposeful. His range of motion was painful in the shoulders and elbows. Supination and pronation caused a little pain, and Plaintiff's low back was tender at the L5, S1 region bilaterally. He exhibited full mobility of the knees, with mild crepitation. Further, Plaintiff had reduced mobility in the hips with regard to external rotation and abduction. Plaintiff also appeared slightly depressed. Dr. Stitzer diagnosed psoriatic arthritis with gouty arthritis component. He noted that past medication did not improve Plaintiff's condition. Dr. Stitzer increased Plaintiff's Oxycontin prescription and recommended that Plaintiff watch his diet and perform light exercise. (Tr. 150) Plaintiff's arthritis was controlled on July 29, 2002. (Tr. 149)

In a letter dated September 18, 2002, Dr. Stitzer stated that Plaintiff had a chronic arthritic condition that would worsen over time. Dr. Stitzer did not feel that an employer would hire Plaintiff, based on his condition and his utilization of narcotics analgesics. (Tr. 160) On November 11, 2002, Dr. Stitzer assessed degenerative arthritis and gouty arthritis, fairly well controlled. Dr. Stitzer noted that absence of joint swelling, redness, or warmth. Plaintiff reported that he was doing pretty fair with his current arthritis medications and did not wish to try Bextra over Celebrex. (Tr. 186)

On April 1, 2003, Dr. Stitzer noted that Plaintiff reported side effects from Lorazepam and Elevil, which did not help him sleep and made him feel groggy the following day. Plaintiff also reported that he forgot to take his Neurontin and that he took the Oxycontin only sparingly because it caused him to vomit. Plaintiff stated that his joints flared up with pain periodically, but he reported no recent joint swelling, redness or warmth. Dr. Stitzer observed that Plaintiff was in no acute distress. His mobility was reduced passively and actively, secondary to arthritis. Dr. Stitzer noted the absence of psoriatic plaques. He discontinued Plaintiff's Oxycontin, Neurontin, and Lorazepam prescriptions and replaced them with Trazodone, Ultracet, and Vicodin. (Tr. 155)

Plaintiff returned to Dr. Stitzer on July 23, 2003, complaining of recent flare-ups of arthritic aches and pains. Plaintiff stated that the medications did not control the pain. The physical examination was unremarkable. Dr. Stitzer assessed psoriatic arthritis, degenerative arthritis, and mild depression. He advised Plaintiff to maintain his medication and added Fentanyl 25 Microgram Patch for pain relief. (Tr. 154) In a letter dated July 31, 2003, Dr. Stitzer reported that Plaintiff's arthritis had flared up to the point the he again required narcotic analgesics. He opined that plaintiff's arthritis was significant enough to prevent him from working. (Tr. 153)

On August 25, 2003, Dr. Stitzer noted that the narcotic analgesics caused nausea and vomiting. Plaintiff displayed full range of motion of the shoulders, and he showed no peripheral syanosis or edema. Dr. Stitzer did not observe any joint swelling, redness, or warmth. (Tr. 194)

Dr. Stitzer assessed chronic shoulder pain and suspected psoriatic arthritis versus severe fibromyalgia with a gouty component after a September 24, 2003 examination. Plaintiff had no particular complaints other than bilateral shoulder pain, left greater than right, arthralgias throughout the body, and fatigue. Plaintiff reported, however, that the medication improved his insomnia.

9

Plaintiff was in no acute distress. He exhibited poor mobility in his shoulders. Dr. Stitzer advised Plaintiff to continue with medications other than to discontinue Ultram. He noted the possibility of a future MRI of the shoulders. (Tr. 195)

On October 31, 2003, Plaintiff underwent a mental health screening. Grant O'Neal, PhD, noted that Plaintiff was cooperative, polite, and responsive, with a sad affect. Plaintiff's thought flow was logical, and there was no evidence of psychosis. His judgment and insight were intact, and his memory was unimpaired. Plaintiff exhibited good concentration, and Dr. O'Neal observed no unusual motor behavior other than Plaintiff's need to stand during the interview in apparent pain. Dr. O'Neal diagnosed Dysthymic Disorder, which was characterized by chronic, low mood but did not meet the criteria for Major Depression. Dr. O'Neal also noted that Plaintiff met the criteria for alcohol abuse. However, he did not believe that Plaintiff's disorders were sufficient to cause significant impairment in Plaintiff's ability to function. He opined that Plaintiff could benefit from education and treatment for managing chronic pain. (Tr. 196-197)

On December 17, 2003, Dr. Stitzer noted that Plaintiff had no particular complaints other than elbow pain. He had full mobility in his shoulders. However, there was tenderness to palpation over the medial epicondylar regions. Dr. Stitzer diagnosed medial epicondylitis, chronic; history of fibromyalgia with psoriatic arthritic component suspected; history of nicotine addiction; and insomnia. He prescribed Medrol Dosepak to calm the flare-up. (Tr. 200)

Plaintiff returned to Dr. Stitzer on March 17, 2004, who noted that Plaintiff had a mixed type of arthritis which included psoriatic arthritis with a gouty component as well as some degenerative component. Dr. Stitzer opined that Plaintiff was disabled and unable to hold down a job. Dr. Stizer reported that Plaintiff's days were mostly bad, including stiffness and pain when trying to work around

10

the house performing minor repairs, lifting heavy objects, and doing work on automobiles. Plaintiff was able to perform his activities of daily living with some difficulty. Plaintiff also complained of left knee discomfort and right shoulder discomfort. The examination revealed reduced mobility of the shoulder and mild reduction of range of motion of the left knee. Dr. Stitzer recommended that Plaintiff continue with the same medications and schedule an MRI of his shoulder and knee. (Tr. 201)

MRIs of Plaintiff's right shoulder and left knee performed on March 30, 2004 revealed some degenerative changes and a Baker's Cyst in the left knee. The radiologist noted a mild impression on Plaintiff's right shoulder, with no fracture or labral abnormality. (Tr. 202)

## **The ALJ's Determination**

In the decision dated August 30, 2002, the ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act at least through the date of the decision. Plaintiff had not engaged in substantial gainful activity since May 25, 2000. Plaintiff had a severe combination of impairments including left shoulder pain status post arthroscopy; history of rheumatoid arthritis, gout, and psoriatic arthritis; fibromyalgia; headaches; and depression. However, his impairments or combination of impairments were not listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 24)

The ALJ further determined that Plaintiff was not a fully credible witness with regard to the severity of his symptoms and the limitations. The ALJ noted that Plaintiff had depression that, in combination with his pain, fatigue, and medication side effects, resulted in slight limitation of activities of daily living and of social functioning. He had moderate limitation of concentration, persistence, or pace that limited his ability to perform detailed or complex work. However, it did not significantly limit his ability to perform simple, repetitive, routine, unskilled work. (Tr. 24)

11

With regard the his residual functional capacity (RFC), the ALJ found that Plaintiff could lift and carry no more than 10 pounds; sit for up to six hours in an eight-hour workday; stand and/or walk for up to two hours in an eight-hour workday. The ALJ noted that Plaintiff had a medically required straight cane that he used occasionally. Plaintiff could only occasionally climb ladders, ramps, stairs, ropes, and scaffolds. However, he could never balance. He could occasionally stoop, kneel, crouch, and crawl. Plaintiff was limited in his ability to reach. Further, he had to avoid concentrated exposure to extremes in heat and cold, vibration, hazardous machinery, and heights. Plaintiff was also limited to simple, repetitive tasks. The ALJ stated that the RFC reflected an ability to perform a range of sedentary work. (Tr. 24-25)

The ALJ determined that Plaintiff was unable to perform his past relevant work. However, based upon his age of a younger individual, his limited education, his skilled past work experience, and the VE testimony, the ALJ found that there were jobs in the national economy which Plaintiff could perform. These jobs included assembly jobs; jobs in the garment and shoe industries such as folding, cutting, buttoning, cleaning, and polishing; and hand assembly jobs. There were 750 such jobs in the 16-county area where Plaintiff resided and 8,000 to 9,000 of these jobs in the State of Missouri. Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 25)

Specifically, the ALJ first noted Plaintiff's prior application and found no good cause to reopen the prior decisions. Thus, the ALJ reviewed the evidence to determine whether Plaintiff had been disabled since May 25, 2000, the day after the date of the prior dismissal. The ALJ then sequentially evaluated Plaintiff's claims, noting that Plaintiff had not engaged in substantial gainful activity since May 25, 2000. Further, the ALJ found that Plaintiff suffered from a severe combination of

12

impairments which did not meet or equal a listing. (Tr. 20-21)

Next, the ALJ assessed Plaintiff's RFC, relying on Plaintiff's testimony and the medical evidence, including Plaintiff's subjective symptoms to the extent that the ALJ found them credible. The ALJ found that, while Plaintiff stated he experienced severe pain in a variety of locations which limited his ability to perform many activities, Plaintiff's account of the severity of the symptoms and limitations was not fully credible. The ALJ noted that the objective evidence failed to support Plaintiff's allegations. Specifically, the ALJ did not give the disability opinions of Dr. Stitzer controlling weight or much deference, as he gave an opinion on a finding of fact reserved for the Commissioner. Further, the ALJ noted that Dr. Stitzer's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial medical evidence. (Tr. 21)

In addition, the ALJ did not give deference to the opinion of Dr. Magrowski regarding Plaintiff's inability to successfully compete in the open available labor market because it was not supported by the evidence. The ALJ found that, while some examinations revealed tenderness, diminished range of motion, and mild crepitation, Dr. Stitzer often found no active synovitis, redness, warmth, or swelling. Further, he often observed that Plaintiff was in no acute distress and that Plaintiff's mobility was fairly good. In addition, Dr. Stitzer did not mention any limitations in Plaintiff's ability to perform daily activities to the extent alleged. (Tr. 22)

With regard to Plaintiff's subjective complaints, the ALJ considered his prior work history and observations by third parties and physicians. The ALJ noted that Plaintiff did not see Dr. Stitzer with the frequency alleged and that mild narcotic analgesics seemed to help Plaintiff best. In addition, Dr. Stitzer encouraged Plaintiff to exercise regularly. The ALJ pointed out the absence of any mental

health treatment or psychiatric hospitalization. Further, Plaintiff's daily activities contradicted a finding of disability. Plaintiff stated that he could sometimes do all household chores with breaks. In addition, Dr. Stitzer often commented that Plaintiff was getting along fair. The ALJ observed that Plaintiff's demeanor during the hearing did not lend great credibility to his testimony. The ALJ also considered the other witnesses' testimonies. He found that the witnesses were credible with regard to Plaintiff's behavior but that the testimonies were not persuasive to the extent that they suggested his behavior resulted from his impairments on a consistent basis. The ALJ further determined that the combination of Plaintiff's depression, pain, fatigue, and side effects from medication resulted in slight limitations in daily activities and social functioning. He had moderate limitations in concentration, persistence, or pace that would limit his ability to perform detailed or complex work. However, the limitations did not significantly limit Plaintiff's ability to perform simple, repetitive, routine work. (Tr. 22-23)

Relying on the VE for step four, the ALJ determined that Plaintiff could not perform his past relevant work. However, at step five, the ALJ noted the VE's answer to the hypothetical question posed by the ALJ. The ALJ found that Plaintiff could perform assembly jobs; jobs in the garment and shoe industries such as folding, cutting, buttoning, cleaning, and polishing; and hand assembly jobs. The ALJ noted that there were 750 such jobs in the 16-county area where Plaintiff resided and 8,000 to 9,000 jobs in Missouri. The ALJ found that this number of jobs constituted a significant number of jobs in the local and state economies and in the national economy. Thus, the ALJ concluded that Plaintiff was not entitled to a period of disability or disability insurance benefits at any time through the date of the decision.

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to her past relevant work; and (5) his impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings

made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

support the opposite conclusion. Marciniak 49 F.3d at 1354.

**Discussion**

Plaintiff argues that the ALJ erred in finding that Plaintiff could perform work that existed in the national economy because he failed to assign controlling weight to the opinion of Plaintiff's treating physician. The Defendant, on the other hand, asserts that the ALJ properly considered Dr. Stitzer's opinion. The undersigned finds that the ALJ did not give the opinion of Plaintiff's treating physician proper weight and that the case should be remanded for further proceedings.

The ALJ found that Dr. Stitzer's opinion regarding Plaintiff's disability was entitled to little weight because it was an opinion on a finding of fact reserved for the Commissioner and because it was not well-supported by medically accepted evidence and was inconsistent with other substantial medical evidence. The ALJ fails to point out the substantial medical evidence that is inconsistent with Dr. Stitzer's opinion. Indeed, the record demonstrates that Dr. Komatireddy, a specialist in immunology and rheumatology, observed that Plaintiff suffered from chronic pain. She also noted that Plaintiff appeared very depressed. Dr. Komatireddy diagnosed fibromyalgia syndrome. (Tr. 140)

Further, Dr. Stitzer prescribed, among other things, Vicodin and Oxycontin which are prescribed for moderate to severe pain. Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002). In fact, Dr. Stitzer frequently changed medications, noting that medications were either ineffective or caused severe side effects.[3] Review of the record demonstrates that none of the physicians who

---

[3] The ALJ also failed to develop the evidence regarding the side effects from medication. Plaintiff testified, and the medical record showed, that the medication(s) caused nausea and drowsiness, which impeded Plaintiff's ability to function. On remand, the ALJ should properly develop the record as to these side effects and their impact on Plaintiff's ability to perform work. See Bowman, 310 F.3d at 1084 (ALJ failed to develop evidence as to the side effects of Skelaxin and Oxycontin).

evaluated Plaintiff questioned plaintiff's pain.  Further, Plaintiff saw Dr. Stitzer on a fairly consistent basis from at least 1998 until 2004 for the same complaints and diagnosis of arthritic pain.  The consistent diagnosis of chronic pain, along with a long history of pain management on drug therapy, are objective medical facts supporting a plaintiff's subjective complaints of pain.  <u>Cox v. Apfel</u>, 160 F.3d 1203, 1208 (8th Cir. 1998).

Despite Dr. Stitzer's statements that Plaintiff was unable to work , which were based on years of treatment, the ALJ disregarded the opinions and instead relied in part upon the RFC findings of a non-examining, non-treating physician.  Opinions of non-examining doctors ordinarily do not constitute substantial evidence on the whole.  <u>Bowman v. Barnhart</u>, 310 F.3d 1080, 1085 (8th Cir. 2002).

Further, the ALJ refused to give Dr. Stitzer's opinions controlling weight based on the fact that Dr. Stitzer's treatment notes did not contain observations regarding whether Plaintiff was limited in his ability to perform daily activities, socialize, concentrate, persist, or maintain pace as severely as alleged.  If the ALJ was dissatisfied with Dr. Stitzer's explanations, she could and should have sought further information.  "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations by treating physicians and others, and claimant's own descriptions of his limitations."  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001) (citation omitted).  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight."  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).  Additionally, "[t]he ALJ has a duty to develop facts fully and fairly, and this duty is enhanced when the claimant is not represented by counsel."  <u>Cox,</u> 160 F.3d at 1209.

In <u>Bowman</u>, the Eighth Circuit Court of Appeals stated that "the ALJ was obligated to contact

18

[plaintiff's treating physician] … for 'additional evidence or clarification,' … and for an assessment of how the 'impairments limited [plaintiff's] ability to engage in work-related activities.'" Bowman, 310 F.3d at 1085 (quoting Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001)). Indeed, an ALJ has the duty to ask plaintiff's doctors to comment on her ability to function in the workplace, as the ALJ "may not draw upon [her] own inferences from medical reports" in assessing plaintiff's RFC. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (quotation omitted).

Because the ALJ failed to give proper weight to Dr. Stitzer and failed the fully and fairly develop the record with regard to Plaintiff's RFC, substantial evidence does not support the ALJ's determination. Further, "the testimony of a vocational expert who responds to a hypothetical based on [opinions of non-examining doctors] is not substantial evidence upon which to base a denial of benefits." Id. (citation omitted). Therefore, the undersigned finds that this case should be remanded for further proceedings.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further proceedings.

The parties are advised that they have eleven (11) days in which to file written objections to

19

this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman<br>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>26th</u> July, 2005.